IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Teresa Ann King, | ) | C/A No.: 1:16-2519-MGL-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be affirmed.

I.    Relevant Background

   A.    Procedural History

On November 30, 2012, Plaintiff protectively filed an application for DIB in which she alleged her disability began on May 6, 2012. Tr. at 79 and 137–41. Her application was denied initially and upon reconsideration. Tr. at 80–83 and 89–94.

Plaintiff subsequently filed an application for SSI on August 27, 2014. Tr. at 11. On September 26, 2014, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Jerry W. Peace. Tr. at 28–59 (Hr'g Tr.). The ALJ issued an unfavorable decision on December 9, 2014, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 8–27. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–6. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on July 12, 2016. [ECF No. 1].

   B.    Plaintiff's Background and Medical History

      1.    Background

Plaintiff was 45 years old at the time of the hearing. Tr. at 34. She completed high school. *Id.* Her past relevant work ("PRW") was as a convenience store manager. Tr. at 55. She alleges she has been unable to work since May 6, 2012. Tr. at 137.

      2.    Medical History

On July 29, 2009, Plaintiff presented to Michael Kilburn, M.D. ("Dr. Kilburn"), and Carrie A. Turner, PA-C ("Ms. Turner"), for a neurological consultation. Tr. at 321–22. They observed Plaintiff to have full range of motion ("ROM"), to be non-tender to palpation and percussion, and to have no paraspinal spasm in her lumbar spine. Tr. at 322. On motor testing, they found Plaintiff to have full, symmetric strength throughout with normal bulk and tone. *Id.* They indicated Plaintiff's sensation was intact to pinprick, light touch, vibration, and position sense. *Id.* Plaintiff had normal bilateral deep tendon

2

reflexes ("DTRs"). *Id.* Dr. Kilburn and Ms. Turner indicated an L5-S1 central and left-sided disc bulge was giving rise to some of Plaintiff's low back and hip discomfort. *Id.* They noted Plaintiff weighed 150–190 pounds over her normal body weight and was experiencing resultant trouble with her right knee and low back. *Id.* They recommended Plaintiff consult a bariatric surgeon and indicated they would reevaluate her if she reduced her weight below 200 pounds and continued to have problems with her back and leg. *Id.*

Plaintiff presented to Connie D. Abbott, N.P. ("Ms. Abbott"), with severe right leg pain on January 18, 2011. Tr. at 289. She described her pain as sharp and shooting and indicated it was worsened by sitting and pressing the accelerator pedal in her car. *Id.* She indicated the pain radiated from her posterior right buttock down her right leg. *Id.* Ms. Abbott indicated Plaintiff had been diagnosed with a disc bulge, facet narrowing on the right, and mild impingement in 2009. *Id.* She stated the neurosurgeon was unwilling to perform surgery until Plaintiff lost some weight. *Id.* Ms. Abbott observed Plaintiff to have asymmetric DTRs in her lower extremities and to be hyper-reflexive on the right. *Id.* She noted tenderness in Plaintiff's right hip and sacroiliac joint. *Id.* She described Plaintiff as being unable to lie down and having a positive straight leg raising ("SLR") test on the right at 30 degrees while standing. *Id.* She prescribed Naproxen and Lortab and instructed Plaintiff to obtain magnetic resonance imaging ("MRI") and to avoid lifting and bending. *Id.*

On January 26, 2011, an MRI of Plaintiff's lumbar spine showed a bulging and protruding disc at L5-S1 that combined with degenerative changes and hypertrophy at the

posterior elements to cause mild central canal stenosis, moderate bilateral neural foraminal narrowing, and central S1 nerve root compression that was greater on the left than the right. Tr. at 293. The findings were unchanged from a July 2009 MRI. *Id.*

Plaintiff followed up with Ms. Abbott to discuss the MRI report on February 2, 2011. Tr. at 287. She continued to complain of severe right leg pain and right foot numbness, but stated her pain was improved by 80% with use of Lortab. *Id.* Ms. Abbott observed Plaintiff to have asymmetric reflexes in her lower extremities and to be hyper-reflexive on the right. *Id.* She noted tenderness in Plaintiff's right sacroiliac joint and stated Plaintiff was unable to lie down because of her pain. *Id.* She indicated Plaintiff had a positive SLR test on her right side at 30 degrees while standing and was tender in her right hip. *Id.* She referred Plaintiff for a neurosurgical consultation. Tr. at 288.

Plaintiff presented to Sybil Reddick, M.D. ("Dr. Reddick"), with a complaint of low back pain and right lower extremity radicular pain on February 8, 2011. Tr. at 367. Dr. Reddick observed Plaintiff to have decreased left patellar, right patellar, right Achilles, and medial hamstring reflexes. Tr. at 368. She observed mild generalized weakness and restricted movement in Plaintiff's lumbar spine and reduced strength in her abdominal muscles. *Id.* She noted no tenderness, crepitation, or edema in Plaintiff's bilateral lower extremities. *Id.* Plaintiff demonstrated 5/5 muscle strength, normal tone, and normal muscle bulk in her bilateral lower extremities. *Id.* She ambulated with an antalgic gait favoring the right side and had a positive SLR test on the right at 45 degrees with leg pain. Tr. at 369. An SLR test was negative on the left. *Id.* Dr. Reddick prescribed

Neurontin and recommended nerve conduction velocity ("NCV") and electromyography ("EMG") studies of Plaintiff's lower extremities. *Id.*

On February 22, 2011, Plaintiff reported her medication regimen was working well, but complained of increased swelling in her left foot. Tr. at 364. Dr. Reddick observed no edema in Plaintiff's spine or lower extremities. Tr. at 365. She noted decreased reflexes in Plaintiff left patella, right patella, right Achilles, and medial hamstring. *Id.* She noted mild generalized tenderness and restricted movement in Plaintiff's lumbar spine. *Id.* Plaintiff had no tenderness or crepitation, normal tone, 5/5 motor strength, normal muscle bulk/no atrophy, and no fasciculations in her bilateral lower extremities. *Id.* An SLR test was positive for leg pain at 45 degrees on the right, but was negative on the left. *Id.* Plaintiff ambulated with an antalgic gait favoring the right. *Id.* Dr. Reddick instructed Plaintiff to follow up after the NCV and EMG testing was completed. Tr. at 366.

On May 10, 2011, Plaintiff complained of bilateral knee pain, but indicated Naproxen was working well. Tr. at 360. She complained of a little swelling in her left foot and requested that Naproxen be refilled. *Id.* Dr. Reddick observed Plaintiff to have 1+ left patellar, right patellar, and right Achilles reflexes. Tr. at 361. She was unable to elicit Plaintiff's hamstring reflexes. *Id.* She noted mild generalized tenderness in Plaintiff's lumbar area; restricted movement in all directions; and reduced strength in her abdominal muscles. *Id.* An SLR test was positive for leg pain at 45 degrees on the right, but negative on the left. Tr. at 361–62. Plaintiff demonstrated no edema or crepitation, and she had normal tone, 5/5 muscle strength, and normal muscle bulk/no atrophy. Tr. at

361. She had some medial joint line tenderness in her left knee and walked with an antalgic gait favoring the right. Tr. at 362. Dr. Reddick reviewed the EMG report and indicated it was normal. *Id.* She refilled Plaintiff's prescription for Naproxen, discontinued Neurontin, and recommended she obtain orthopedic shoes with support. *Id.*

Plaintiff presented to Brian Henry, M.D. ("Dr. Henry"), with a complaint of back pain that radiated to her right thigh and posterior knee on November 28, 2011. Tr. at 285. Dr. Henry indicated Plaintiff had asymmetric DTRs in her lower extremities and was hyper-reflexive on the right. *Id.* He noted Plaintiff had 4–5/5 strength in her right lower extremity and was tender at her right sacroiliac joint. *Id.* Plaintiff was unable to lie down and had a positive SLR test. *Id.* She was tender in her right hip. *Id.* Dr. Henry assessed degenerative disc disease, not otherwise specified ("NOS"), and radiculopathy. *Id.* He refilled Plaintiff's prescription for Lortab and prescribed Naproxen. *Id.*

On February 9, 2012, Plaintiff indicated to Ryan Groth, PA-C ("Mr. Groth"), that she experienced aching pain in her knees and buttocks. Tr. at 214. She stated she had been unable to afford to follow up for pain management treatment and had received prescriptions for Naproxen and Hydrocodone from Dr. Henry in November. *Id.* Plaintiff reported balance problems and difficulty walking. Tr. at 217. Mr. Groth observed Plaintiff to be 5'5" tall and to weigh 330 pounds. *Id.* He noted Plaintiff had 1+ left patellar, 1+ right patellar, and 1+ right Achilles reflexes. *Id.* He was unable to elicit medial hamstring reflexes. *Id.* Plaintiff demonstrated mild generalized tenderness in her lumbar area. *Id.* Her movement was restricted in all directions, and she had reduced strength in her abdominal muscles. *Id.* An SLR test was positive for leg pain at 45

6

degrees on the right. Tr. at 218. Plaintiff walked with an antalgic gait and favored the right. *Id.* Mr. Groth recommended Plaintiff obtain orthopedic shoes and refilled her prescription for Naproxen and Tramadol. Tr. at 218 and 219. He referred Plaintiff for bilateral knee x-rays. Tr. at 219.

Plaintiff followed up with Dr. Reddick on March 15, 2012. Tr. at 220. She reported that her medications were ineffective and that her right knee pain had worsened. *Id.* Dr. Reddick observed Plaintiff to have 1+ right patellar, left patellar, and right Achilles reflexes. Tr. at 221. She was unable to elicit medial hamstring reflexes. *Id.* Plaintiff demonstrated mild generalized tenderness in her lumbar area, restricted movement in all directions, and reduced strength in her abdominal muscles. Tr. at 221–22. An SLR test was positive for leg pain at 45 degrees. Tr. at 222. Dr. Reddick indicated Plaintiff was tender to palpation and had mild swelling over her medial joint line. *Id.* She refilled Lortab, discontinued Tramadol, and referred Plaintiff for an MRI of her left knee. *Id.*

On March 22, 2012, x-rays of Plaintiff's left knee showed three-compartment knee joint degeneration that was most prominent in the medial compartment. Tr. at 233. An MRI indicated medial tibial plateau bone contusion, medial meniscal degeneration, and moderate osteoarthritis. Tr. at 234.

On March 29, 2012, Plaintiff reported Lortab provided some relief, but did not take away all her pain. Tr. at 227. Dr. Reddick indicated Plaintiff weighed 350 pounds. Tr. at 228. She observed Plaintiff to have reduced reflexes, mild generalized tenderness in the lumbar area, restricted movement in all directions, and reduced strength in the

abdominal muscles. Tr. at 228–29. She noted Plaintiff demonstrated an antalgic gait favoring the right and had a positive SLR test at 45 degrees for leg pain. Tr. at 229. She noted Plaintiff had experienced a negative reaction to the previous steroid joint injection. *Id.* She scheduled Plaintiff for a Hyalgan injection in her left knee and instructed her to take one-and-a-half Lortab pills at a time. *Id.*

Plaintiff received Hyalgan injections in her left knee on April 18, April 25, May 2, May 9, and May 16, 2012. Tr. at 238, 239, 244, 247, and 254. She tolerated the injections without complications. *Id.*

On August 7, 2012, Plaintiff complained of bilateral knee pain that worsened when she stood for long periods. Tr. at 281. She reported swelling in her left lower leg. *Id.* Ms. Abbott observed edema in Plaintiff's left leg after she removed a knee brace. *Id.* She noted medial tenderness, pain with flexion and extension, and 2+ pitting edema in Plaintiff's left foot. *Id.* She referred Plaintiff to Lakelands Orthopedics for an evaluation of knee pain and prescribed Lasix for edema. *Id.*

On August 27, 2012, John H. Cathcart, III, M.D. ("Dr. Cathcart"), indicated Plaintiff had no obvious swelling in her knees, but had pitting edema in her bilateral lower extremities. Tr. at 265. He noted Plaintiff was able to extend her left knee and flex to about 120 degrees. *Id.* Plaintiff complained of pain medially and laterally and had patellofemoral grinding on both sides. *Id.* She demonstrated adequate ROM in her hip and had a negative SLR test. *Id.* Dr. Cathcart assessed end-stage arthritis of the left knee and obesity. *Id.* He indicated Plaintiff needed a knee replacement, but that his partners would be reluctant to perform the surgery based on her age and weight. Tr. at 266. He

stated Plaintiff would need to demonstrate an ability to lose weight to be a candidate for surgery and may be a candidate for gastric weight loss procedures. *Id.*

Plaintiff followed up with Ms. Abbott on September 4, 2012. Tr. at 279. She reported consuming many high-fat meals and indicated she was unable to exercise because of pain in her joints. Tr. at 279. Ms. Abbott indicated Plaintiff weighed 367 pounds. *Id.* She noted edema when Plaintiff removed her knee brace. *Id.* Plaintiff demonstrated tenderness medially, pain with flexion and extension, and 2+ pitting edema. *Id.* Ms. Abbott discussed possible weight reduction options with Plaintiff, and Plaintiff opted to use Phentermine. Tr. at 280. Ms. Abbott refilled a prescription for Lasix for swelling and prescribed Phentermine for weight loss. *Id.*

Plaintiff presented to Charles Gray, M.D. ("Dr. Gray"), on September 10, 2012. Tr. at 262. She reported a constant, sharp pain in her left knee. *Id.* She also endorsed pain in her right knee, but indicated it was not as severe. *Id.* She reported a history of reactions to both Cortisone and Hyalgan injections. *Id.* Dr. Gray observed that Plaintiff's knee had near-full extension and flexed to 90 degrees. *Id.* He noted Plaintiff had no instability. *Id.* He observed medial and lateral tenderness, but indicated he could not determine if there was an effusion. *Id.* He discussed with Plaintiff the procedure and possible complications of knee replacement, and Plaintiff opted not to pursue it. *Id.* Plaintiff indicated she would try to reduce her weight. *Id.* Dr. Gray recommended she join a water exercise program and use Osteo Bi-Flex. *Id.* He prescribed a trial of Mobic. *Id.*

On October 2, 2012, Plaintiff reported decreased appetite and having made dietary changes. Tr. at 277. She indicated she intended to participate in a water therapy program.

*Id.* After Plaintiff removed her brace, Ms. Abbott observed Plaintiff to have some edema in her left knee. *Id.* She indicated Plaintiff had some tenderness medially, pain with flexion and extension, and 2+ pitting edema in her left foot. *Id.*

On November 6, 2012, Plaintiff reported having lost four pounds over the prior month despite the fact that she ate fatty foods while vacationing in Texas. Tr. at 276. Ms. Abbott indicated that Plaintiff was wearing a knee brace and that edema was evident when she removed it. *Id.* She observed Plaintiff to be tender medially, to have pain with flexion and extension, and to demonstrate 2+ pitting edema in her left foot. *Id.* She noted Plaintiff was using Lortab sparingly. Tr. at 276.

Plaintiff followed up with Ms. Abbott regarding her weight loss efforts on December 4, 2012. Tr. at 273. Ms. Abbott noted that Plaintiff had lost five pounds over the last month. *Id.* She observed Plaintiff to have no clubbing or edema and full ROM of her extremities, but noted some crepitus with knee flexion and extension. *Id.* Ms. Abbott indicated Plaintiff was no longer seeing her pain management provider and was taking Lortab sparingly. Tr. at 274.

Plaintiff reported some improvement with use of anti-inflammatory medications on January 2, 2013. Tr. at 306. She complained of morning stiffness, but indicated she had lost approximately 20 pounds. *Id.* Dr. Gray encouraged Plaintiff to continue with weight reduction and exercise. *Id.* He refilled Meloxicam and advised Plaintiff to return in six months. *Id.*

On January 4, 2013, Plaintiff indicated she had indulged over the holidays, but had not gained weight. Tr. at 271. She stated she intended to join a weight loss program, but

was unable to afford it. *Id.* She continued to report knee pain. *Id.* She stated Meloxicam was helpful, but she could only take it at night because it made her sleepy. *Id.* She indicated she took Lortab only when her pain was "really bad." *Id.* Ms. Abbott observed that Plaintiff weighed 348.60 pounds. *Id.* She noted Plaintiff had normal dorsalis pedis pulses, no clubbing or edema in her extremities, and full ROM. *Id.* However, she indicated Plaintiff demonstrated some crepitus with flexion and extension. *Id.* She continued Plaintiff's prescriptions for Phentermine, Lortab, and Meloxicam. Tr. at 272.

On February 9, 2013, state agency medical consultant Frank Ferrell, M.D. ("Dr. Ferrell"), determined Plaintiff had the residual functional capacity ("RFC") to occasionally lift and/or carry 10 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of two hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; never climb ladders, ropes, and scaffolds; and should avoid concentrated exposure to hazards. Tr. at 63–65.

On March 4, 2013, Plaintiff reported she was no longer able to tolerate Phentermine and had discontinued it during the prior month. Tr. at 297. Plaintiff weighed 350 pounds. *Id.* Ms. Abbott observed Plaintiff to demonstrated 5/5 motor strength in her bilateral upper and lower extremities; no clubbing; no edema; full ROM; crepitus with flexion and extension of her knee; a diffusely tender right trapezius; and pain in the anterior aspect of her right shoulder. Tr. at 297–98. She assessed tachycardia, morbid obesity, knee pain, depression, and shoulder pain. Tr. at 298. However, she noted that Plaintiff's tachycardia had resolved since she stopped taking Phentermine. *Id.* Ms. Abbott

11

advised Plaintiff to control her portions and to continue positive dietary changes. *Id.* She noted Plaintiff continued to use Lortab sparingly, but refilled the medication. *Id.* She increased Plaintiff's dose of Meloxicam. *Id.* Plaintiff declined a prescription for an antidepressant medication. *Id.*

On April 11, 2013, state agency medical consultant James Upchurch, M.D. ("Dr. Upchurch"), completed an RFC assessment and found that Plaintiff could occasionally lift and/or carry 20 pounds; could frequently lift and/or carry 10 pounds; could stand and/or walk for a total of two hours; could sit for a total of six hours during an eight-hour workday; could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; could never climb ladders, ropes, or scaffolds; should avoid concentrated exposure to extreme cold, extreme heat, and vibration; should avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, etc.; and should avoid all exposure to hazards. Tr. at 73–76.

On July 1, 2013, Plaintiff complained of pain in her knee and stated she was taking Meloxicam daily. Tr. at 305. Dr. Gray indicated Plaintiff had not lost any additional weight. *Id.* He observed Plaintiff to have edema in her legs and prescribed support stockings. *Id.* He advised Plaintiff to visit her family doctor for possible diuretics and to determine the effect of anti-inflammatory medications on her edema. *Id.* He encouraged Plaintiff to continue to work on losing weight. *Id.*

Plaintiff presented to Courtney Burton, F.N.P. ("Ms. Burton"), on October 23, 2013, for a six-month follow up. Tr. at 318. She reported pain in her knee and lower back and difficulty with weight loss. *Id.* She indicated she took Lortab only when her pain was

"really bad." *Id.* She denied edema. *Id.* Ms. Burton observed Plaintiff to demonstrate 5/5 motor strength in her bilateral upper and lower extremities, 2+ peripheral pulses bilaterally, no clubbing, trace edema to the bilateral lower extremities, full ROM, and crepitus with flexion and extension of the knee. Tr. at 319. She encouraged Plaintiff to maintain a healthy diet and to pursue water therapy. *Id.* She noted that Plaintiff continued to use Lortab "very sparingly." *Id.* Plaintiff denied an exacerbation of depressive symptoms and indicated she felt like she was managing well. *Id.*

On January 9, 2014, Plaintiff reported that her right knee was giving way and her left knee was locking more often. Tr. at 304. Dr. Gray noted some varus deformities and medial and lateral tenderness, but stated Plaintiff had good ROM and no instability. *Id.* He refilled Plaintiff's prescription for Meloxicam and indicated that her only option for relief was knee replacement. *Id.*

On April 23, 2014, Plaintiff reported she had started Weight Watchers and was using a stationary bike for exercise. Tr. at 357. She continued to complain of low back and knee pain, but indicated that Meloxicam was helpful and that she took Lortab only when her pain was "really bad." *Id.* She reported problems with increased thirst and facial hair, and Ms. Burton noted that her A1c was slightly elevated at her last visit. *Id.* Ms. Burton observed Plaintiff to have 5/5 motor strength in her bilateral upper and lower extremities; no clubbing; trace edema in the bilateral lower extremities; and normal peripheral pulses. Tr. at 358. She assessed non-insulin dependent diabetes mellitus and hirsutism. *Id.* She prescribed Cyclobenzaprine and Norco for back pain. *Id.*

On May 6, 2014, Plaintiff requested that Ms. Burton complete disability forms. Tr. at 355. She complained of pain in her back and knees. *Id.* She stated she had recently attempted to clean her bathroom and was unable to move the next day. *Id.* Ms. Burton observed Plaintiff to have 5/5 motor strength in her bilateral upper and lower extremities; normal peripheral pulses; no clubbing; trace edema to the bilateral lower extremities; tenderness to palpation in the lumbar region; negative SLR test bilaterally; normal motor functioning; normal reflexes; and slowed gait. Tr. at 356. She continued Plaintiff's prescriptions for Lortab and Meloxicam and encouraged Plaintiff to lose weight and to engage in mild exercise. *Id.* Ms. Burton indicated work-preclusive restrictions in a medical source statement. Tr. at 323–25. She also indicated Plaintiff's impairments met the requirements for a finding of disability under Listing 1.02. Tr. at 326.

Plaintiff presented to the emergency room at Self Regional Healthcare on June 8, 2014, with a complaint of back pain that radiated to her chest and neck. Tr. at 329. She was diagnosed with a gallbladder obstruction. Tr. at 332.

On June 16, 2014, Plaintiff indicated she was still experiencing some nausea, but that Zofran was helpful. Tr. at 352. She complained of knee and low back pain, but indicated Meloxicam helped her knee pain and that she only took Lortab when her back pain was "really bad." *Id.* Ms. Burton recorded Plaintiff's weight to be 324 pounds. Tr. at 353. She observed Plaintiff to have 5/5 motor strength in her bilateral upper and lower extremities; normal peripheral pulses; no clubbing; trace edema in the bilateral lower extremities; tenderness to palpation in the lumbar spine; negative SLR test; normal motor functioning; normal reflexes; and slowed gait due to weight and knee pain. *Id.* She

14

refilled Plaintiff's prescriptions for Lortab and Meloxicam and encouraged her to engage in "mild exercise such as walking." *Id.*

On August 15, 2014, Plaintiff underwent laparoscopic surgery to remove her gallbladder. Tr. at 379.

Plaintiff presented to Ronald M. Tollison, M.D. ("Dr. Tollison"), for an independent medical evaluation on August 29, 2014. Tr. at 390–91. She reported chronic pain in her back and knees, as well as swelling in her left knee. Tr. at 390. Dr. Tollison observed Plaintiff to ambulate with a limp favoring her left leg. *Id.* He stated she required assistance in getting on and off the exam table. *Id.* He noted Plaintiff had full ROM of her shoulders, elbows, fingers, and wrists. *Id.* He observed mild tenderness to palpation in her lower back. *Id.* Dr. Tollison indicated Plaintiff was unable to touch the floor with her hands or to do a knee squat. *Id.* He stated she had full ROM of her hips. *Id.* He observed her to have crepitation and swelling in both knees and noted her left knee was more swollen than her right with 1+ edema. *Id.* Dr. Tollison indicated Plaintiff had 1+ and symmetrical DTRs. *Id.* His diagnostic impressions were osteoarthritis of the knees with history of meniscal degeneration, morbid obesity, degenerative disc disease, polycystic ovarian disease, and status post-cholecystecomy. *Id.* He completed a medical source statement. Tr. at 392–94.

C.    The Administrative Proceedings

1.    The Administrative Hearing

a.    Plaintiff's Testimony

At the hearing on September 26, 2014, Plaintiff testified that she had worked as a store manager at The Pantry for 18 years. Tr. at 36. She indicated she had stopped working because of problems with her knees and back and had been unable to return to work. *Id.* She stated she initially received short-term disability benefits and had subsequently withdrawn money from an individual retirement account ("IRA") to cover living expenses. Tr. at 36–37. She testified she had stopped seeing her pain management physician because she could no longer afford the visits. Tr. at 51.

Plaintiff stated she was unable to work because of problems with her lower back, bilateral knees, swelling in her legs, and obesity. Tr. at 37. She testified she was 5'5" tall and weighed 322 pounds. Tr. at 34. She stated that she had weighed as much as 362 pounds, but indicated her weight was generally around 320 pounds. *Id.* She described her knee pain as constant. Tr. at 37. She stated her pain was reduced, but was not completely relieved by elevating her legs. *Id.* She indicated she had previously been treated with Cortisone injections, but had experienced a severe allergic reaction and could no longer be treated with Cortisone. Tr. at 38. She stated she had received Silicone injections in her knees, but that they had only exacerbated her symptoms. *Id.*

Plaintiff testified she experienced swelling in her lower extremities. Tr. at 47. She indicated she had to buy a larger shoe size and was unable to wear shoes with heels or

laces because of swelling. *Id.* She stated her providers had prescribed compression stockings, but denied that they reduced her swelling. *Id.*

Plaintiff testified that her medications lessened her pain, but did not eliminate it. Tr. at 42. She stated the medications reduced her concentration and that she was not supposed to drive while taking them. *Id.*

Plaintiff testified she could stand for 10 minutes; sit for 15 to 20 minutes; and walk for 15 to 20 minutes at a time. Tr. at 43. She stated she could lift no more than 10 pounds. *Id.* She denied having to use a walker or cane. Tr. at 43–44. She indicated she was unable to bend to pick up items from the floor. *Id.* She estimated she elevated her legs above hip level for over 50% of the day. Tr. at 47–48. She indicated she applied ice to her knees for 45 minutes to an hour three times a day. Tr. at 50–51.

Plaintiff testified she had a driver's license and owned a vehicle. Tr. at 35. She indicated she typically sat in a chair with her legs elevated. Tr. at 38. She indicated she had hand rails installed because she had fallen while attempting to get in and out of the shower. *Id.* She stated she could no longer shave her legs. *Id.* She indicated she prepared quick meals because she could no longer stand to cook. *Id.* She testified she played games and talked on her phone. Tr. at 39. She stated she washed a few dishes at a time. *Id.* She indicated her roommate usually washed her laundry and brought it to her to fold. Tr. at 39–40. She testified she was able to dust, but could not sweep or clean her bathtub. Tr. at 40. She indicated she would go shopping with her roommate or mother, but had difficulty walking because her right knee would lock up after 15 to 20 minutes. Tr. at 40–41. She stated she visited with family at her sister's house on holidays. Tr. at 41. Plaintiff

17

denied going to church and to movies, but indicated she occasionally met friends for meals. *Id.* She stated she used a stationary bike twice a day for 10 minutes at a time. Tr. at 44. She indicated her back pain prevented her from sleeping for more than five to six hours per night. Tr. at 48. She acknowledged having taken a car trip to Texas in 2012, but indicated that her parents drove and that she had to stop every two hours. Tr. at 53.

b.    Vocational Expert Testimony

Vocational Expert ("VE") Benson Hecker, Ph. D., reviewed the record and testified at the hearing. Tr. at 53–58. The VE categorized Plaintiff's PRW as a convenience store manager, *Dictionary of Occupational Titles* ("*DOT*") number 185.167-047, as light with a specific vocational preparation ("SVP") of seven. Tr. at 55. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could lift and carry up to 20 pounds occasionally and up to 10 pounds frequently; could stand and walk for approximately six hours during an eight-hour workday; could sit for approximately six hours during an eight-hour workday; could never climb ladders, ropes, or scaffolds; could occasionally climb ramps or stairs, balance, stoop, crouch, kneel, and crawl; must avoid concentrated exposure to extreme cold, extreme heat, and excessive vibration; must avoid concentrated exposure to environmental irritants such as fumes, odors, dust, and gases; and must avoid concentrated exposure to moving machinery and unprotected heights. *Id.* The VE testified that the hypothetical individual would be unable to perform Plaintiff's PRW as she performed it or as it is generally performed in the national economy. Tr. at 56. The ALJ asked whether there were any other jobs in the regional or national economy that the hypothetical person could perform. *Id.* The VE identified jobs

3e8fbdb8af0ae00a

as a cashier II, *DOT* number 211.462-010, with 3,000,000 positions nationally and 5,700 positions in South Carolina; an assembler, *DOT* number 706.684-022, with 229,000 positions nationally and 2,700 positions in South Carolina; and a mail clerk, *DOT* number 209.687-026, with 119,000 positions nationally and 1,400 positions in South Carolina. *Id.*

The ALJ next asked the VE to consider a hypothetical individual of Plaintiff's vocational profile who could perform sedentary work; lift up to 10 pounds occasionally; stand or walk for approximately two hours in an eight-hour workday; sit for six hours in an eight-hour workday; never climb ladders, ropes, scaffolds, ramps, or stairs; occasionally balance and stoop; and never crouch, kneel, or crawl. Tr. at 57. He further provided that the individual must avoid concentrated exposure to extreme cold and heat, excessive vibration, moving machinery, unprotected heights, and environmental irritants such as fumes, odors, dust, and gases. *Id.* The VE testified the individual could perform sedentary jobs as an order clerk, *DOT* number 209.567-014, with 211,000 positions nationally and 1,700 positions in South Carolina; a surveillance monitor, *DOT* number 379.367-010, with 79,000 positions nationally and 790 positions in South Carolina; and an assembler, *DOT* number 739.684-094, with 200,000 positions in the national economy and 2,000 positions in South Carolina. *Id.*

The ALJ asked the VE to consider a hypothetical individual who was limited as provided in the previous question, but who must also apply ice to her knees three to four times daily for 45 minutes to one hour each time. *Id.* He asked if any jobs would be available for an individual with those limitations. *Id.* The VE indicated there would be no jobs. *Id.*

Plaintiff's attorney asked the VE to consider the second hypothetical question, but to further assume the individual would have to elevate her leg to at least hip height for 15 to 20 minutes at a time, three to four times per day. Tr. at 58. He asked if there would be any competitive work available. *Id.* The VE testified that there would be no work. *Id.*

Plaintiff's attorney asked the VE to assume the other restrictions in the second hypothetical question, but to further assume the individual would be limited to sitting for a total of six hours in an eight-hour workday and standing and walking for one hour in an eight-hour workday. *Id.* He asked if the individual could engage in any competitive employment. *Id.* The VE responded that she could not. *Id.*

Plaintiff's attorney asked the VE to consider the restrictions in the second hypothetical question, but to further assume the individual would miss at least three days of work per month as a result of pain or other physical symptoms. *Id.* He asked if any competitive work would be available to the individual. *Id.* The VE testified there would be no competitive work. *Id.*

### 2.    The ALJ's Findings

In his decision dated December 9, 2014, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2017.
2.    The claimant has not engaged in substantial gainful activity since May 6, 2012, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).
3.    The claimant has the following severe impairments: osteoarthritis, degenerative disc disease, and obesity (20 CFR 404.1520(c) and 416.920(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1526, 416.920(d), 416.925 and 416.926).

5.    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except that the claimant can never climb ladders, ropes, scaffolds, ramps and stairs. The claimant can occasionally balance and stoop, but she can never crouch, kneel, or crawl. She must avoid concentrated exposure to extreme cold, heat, and excessive vibration. The claimant must also avoid concentrated use of moving machinery and concentrated exposure to unprotected heights.

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.    The claimant was born on April 17, 1969 and was 43 years old, which is defined as a younger individual age 18–44, on the alleged disability onset date. The claimant subsequently changed age category to a younger individual age 45–49 (20 CFR 404.1563 and 416.963).

8.    The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.   The claimant has not been under a disability, as defined in the Social Security Act, from May 6, 2012, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. at 13–23.

II.    Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)    the ALJ erred in neglecting to consider Plaintiff's lower extremity edema as a severe impairment;

2)    the ALJ did not adequately consider whether Plaintiff's impairments met or equaled the requirements for a finding of disability under Listing 1.04(A); and

3)    the ALJ erred in according little weight to opinion statements from Dr. Tollison and Ms. Burton.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following:  (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that

impairment meets or equals an impairment included in the Listings;[1] (4) whether such impairment prevents claimant from performing PRW;[2] and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520 and § 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) and § 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b) and § 416.920(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

---

[1] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525 and § 416.925. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii) and § 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526 and § 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[2] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h) and § 416.920(h).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

### 2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is

24

supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.    Analysis

1.    Lower Extremity Edema

Plaintiff argues the ALJ failed to consider the effect of lower extremity edema on her ability to work. [ECF No. 10 at 17]. She maintains the ALJ did not adequately consider evidence that suggested she was required to elevate her legs at hip-height for approximately 50% of the day. *Id.* at 18–19. She contends that the VE's testimony confirms that her need to elevate her legs would preclude work. *Id.* at 19.

The Commissioner argues that although the ALJ did not address Plaintiff's edema at step two, he discussed it throughout the decision. [ECF No. 14 at 14]. She maintains the ALJ cited evidence that refuted Plaintiff's asserted need to elevate her legs for 50% of the day. *Id.* She contends that Plaintiff failed to show objective evidence that edema significantly affected her ability to perform basic work activities or required accommodations in her assessed RFC. *Id.*

A severe impairment "significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c) and § 416.920(c); *see also* SSR 96-3p. A non-severe impairment "must be a slight abnormality (or a combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities." SSR 96-3p, citing SSR 85-28; *see also* 20 C.F.R. § 404.1521(a) and § 416.921(a) ("An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities.[3]").

The ALJ's recognition of a single severe impairment at step two ensures that he will progress to step three. *See Carpenter v. Astrue*, 537 F.3d 1264, 1266 (10th Cir. 2008) ("[A]ny error here became harmless when the ALJ reached the proper conclusion that [claimant] could not be denied benefits conclusively at step two and proceeded to the next step of the evaluation sequence."). Therefore, this court has found no reversible error where the ALJ neglected to find an impairment to be severe at step two provided that he considered that impairment in subsequent steps. *See Washington v. Astrue*, 698 F. Supp. 2d 562, 580 (D.S.C. 2010) (collecting cases); *Singleton v. Astrue*, No. 9:08-1982-CMC, 2009 WL 1942191, at *3 (D.S.C. July 2, 2009).

To adequately assess an individual's RFC, the ALJ must determine the limitations imposed by her impairments and how those limitations affect her ability to perform work-

---

[3] Basic work activities include physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; capacities for seeing, hearing, and speaking; understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, coworkers, and usual work situations; and dealing with changes in a routine work setting. 20 C.F.R. § 404.1521(b) and § 416.921(b).

related physical and mental abilities on a regular and continuing basis. SSR 96-8p. The ALJ should consider all the claimant's allegations of physical and mental limitations and restrictions, including those that result from severe and non-severe impairments. *Id.* "The RFC assessment must include a narrative discussion describing how all the relevant evidence in the case record supports each conclusion and must cite specific medical facts (e.g., laboratory findings) and non-medical evidence (e.g., daily activities, observations)." *Id.* The ALJ must also consider and explain how any material inconsistencies or ambiguities in the record were resolved. *Id.* "The RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." *Id.* "[R]emand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015), citing *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013).

The ALJ found that Plaintiff's severe impairments included osteoarthritis, degenerative disc disease, and obesity. Tr. at 13. He did not address Plaintiff's lower extremity edema at step two (Tr. at 17), but considered it in assessing her RFC. *See* Tr. at 16–21.

The ALJ cited evidence that demonstrated Plaintiff to have no edema during some examinations and varying levels of edema during other examinations. *See* Tr. at 17–21. He stated Plaintiff "has been found to have pitting edema in both lower extremities.

(Exhibits 3F–4F)." Tr. at 17. He noted that in September 2012 and March 2013, Plaintiff had no edema; in June 2014, she had only trace edema; and in August 2014, she had 1+ edema on the left. Tr. at 18 and 19.

The ALJ considered Plaintiff's statements, but found that her testimony as to the amount of time she needed to elevate her legs was inconsistent with her reported ADLs. He indicated Plaintiff had testified that "[s]he had to elevate her legs above her heart, which helped with her pain." Tr. at 16. He stated Plaintiff had complained of "morning stiffness and swelling in her lower extremities." Tr. at 17. He noted that while Plaintiff "stated that she sat in a recliner with her legs elevated, she also indicated that she was up and down all day." Tr. at 19–20.

The ALJ considered evidence in addition to Plaintiff's statements regarding the effects of lower extremity edema. He acknowledged that Plaintiff had "been prescribed support stockings for her leg edema. (Exhibit 6F)." Tr. at 17. He stated "[e]ven though NP Burton determined that the claimant needed to elevate her legs to heart level and while the claimant has indicated a need to elevate her legs, this primarily appears to be a hearing related development that is not well-established by the other evidence of record." Tr. at 21. He noted that "Dr. Tollison found that the claimant did not need to elevate her legs." *Id.*

The ALJ explained that the assessed RFC accounted for Plaintiff's credibly-established functional limitation. He acknowledged that Plaintiff's representative argued, in part, that chronic edema in Plaintiff's lower extremities prevented her from engaging in sedentary work on a regular and continuing basis. Tr. at 21. However, he stated he was

"unpersuaded" and that the assessed RFC "finds support, at least in part, from the claimant's level of treatment; her symptoms, such as pain and limited mobility; the claimant's activities of daily living; and the clinical findings upon examination." *Id.*

Any error in failing to address Plaintiff's lower extremity edema at step two was rendered harmless by the ALJ's acknowledgment of the impairment in explaining his RFC finding.[4] *See Washington*, 698 F. Supp. 2d at 580; *Singleton*, 2009 WL 1942191, at *3. The ALJ acknowledged that the record contained conflicting evidence regarding Plaintiff's need to elevate her legs and cited adequate reasons to support his conclusion that the restriction was not sustained by the record. *See* Tr. at 19–20 and 21. Thus, the ALJ satisfied his duty "to resolve conflicts in the evidence." *Slaughter v. Barnhart*, 124 F. App'x 156, 157 (4th Cir, 2005), citing *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984). He concluded that Plaintiff's lower extremity edema was adequately addressed by the restrictions included in the RFC assessment. *See* Tr. at 21. Therefore, the ALJ did not ignore the impairment, but rather found that it was addressed by other exertional and non-exertional limitations. Because the ALJ cited conflicting evidence regarding Plaintiff's edema and provided reasons for concluding she was not required to elevate her legs for

---

[4] Plaintiff claims that the Commissioner engages in impermissible "post hoc rationalization" in arguing that the ALJ's failure to address her lower extremity edema at step two was rendered harmless by his discussion of the impairment in subsequent steps. [ECF No. 15 at 2]. The undersigned notes that the Commissioner's argument is based on this court's precedent in *Washington* and *Singleton*. Furthermore, an ALJ could never make such an argument on his own behalf because, if he acknowledged an error in assessing severe impairments at step two prior to issuing a decision, he could simply edit his step two determination to reflect all the impairments that he found to significantly limit the claimant's physical or mental ability to do basic work activities.

50% of the workday, the undersigned recommends the court find he adequately addressed the impairment.

    2.    Listing 1.04

Plaintiff argues the ALJ erred in finding that her impairment did not meet or equal the severity of Listing 1.04(A). [ECF No. 10 at 20–21]. She maintains the ALJ erred in failing to grant her request that she be referred for a consultative examination in order that a physician may address whether her impairment met the Listing. *Id.* at 21. She contends the ALJ failed to compare each of the criteria in Listing 1.04(A) with the evidence of record. *Id.* at 21–22. In the alternative, Plaintiff claims the ALJ should have obtained an opinion from a state agency medical consultant as to whether her impairment met or equaled Listing 1.04(A). *Id.* at 22–23.

The Commissioner argues that substantial evidence supports the ALJ's finding that Plaintiff's impairments did not meet the requirements for a finding of disability under Listing 1.04(A). [ECF No. 14 at 16]. She maintains the ALJ acknowledged that Plaintiff had nerve root compression, but that the evidence showed no signs of motor loss, muscle atrophy, or weakness. *Id.* She contends the ALJ was not required to obtain a consultative examination or expert opinion as to whether Plaintiff's impairments met or equaled the Listing. *Id.* at 16–17. She argues that ALJs may exercise discretion in determining whether a medical expert is needed. *Id.* at 17.

At step three of the sequential evaluation, the Commissioner must determine whether the claimant has an impairment that meets or equals one of the impairments listed in the regulations and is therefore presumptively disabled.  The ALJ should identify

relevant Listings and compare their medical criteria with the symptoms, signs, and laboratory findings of the claimant's impairments, as shown in the medical evidence. *Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986); 20 C.F.R. § 404.1508 and § 416.908. "For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (emphasis added). It is not enough that the impairments have the diagnosis of a listed impairment; the claimant must also meet the criteria found in the Listing of that impairment. 20 C.F.R. § 404.1525(d) and § 416.925(d).

The Commissioner may also determine that the claimant's impairment is medically equivalent to a Listing if it is at least equal in severity and duration to the criteria of a Listing. 20 C.F.R. § 404.1526(a) and § 416.926(a). There are three ways to establish medical equivalence: (1) if the claimant has an impairment found in the Listings, but does not exhibit one or more of the findings specified in the particular Listing or one of the findings is not as severe as specified in the particular Listing, then equivalence will be found if the claimant has other findings related to the listed impairment that are at least of equal medical significance to the required criteria; (2) if the claimant has an impairment not described in the Listings, but the findings related to the impairment are at least of equal medical significance to those of a particular Listing; or (3) if the claimant has a combination of impairments and no singular impairment meets a particular Listing, but the findings related to the impairments are at least of equal medical significance to those of a Listing. 20 C.F.R. § 404.1526(b) and § 416.926(b).

"A claimant is entitled to a conclusive presumption that he is disabled if he can show that his disorder results in compromise of a nerve root or the spinal cord." *Henderson v. Colvin*, 643 F. App'x 273, 276 (4th Cir. 2016). "Listing 1.04(A) further describes the criteria a claimant must meet or equal to merit a conclusive presumption of disability arising out of compromise of a nerve root or the spinal cord: evidence of nerve root compression characterized by (1) neuro-anatomic distribution of pain, (2) limitation of motion of the spine, (3) motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, (4) positive straight leg raising test (sitting and supine)." *Id.*; *see also* 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 1.04(A). The court emphasized that the claimant bears the burden of demonstrating that her impairment or impairments meet or equal the Listing. *Id.*, citing *Kellough v. Heckler*, 785 F.2d 1147, 1152 (4th Cir. 1986); *see also Monroe v. Colvin*, 826 F.3d 176, 179 (4th Cir. 2016) ("At the third step, the burden remains on the claimant, *see Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995), and he can establish his disability if he shows that his impairments match a listed impairment, *see Mascio*, 780 F.3d at 634–35.").

Nevertheless, "the ALJ has a duty to explore all relevant facts and inquire into the issues necessary for adequate development of the record, and cannot rely on the evidence submitted by the claimant when that evidence is inadequate." *Cook*, 783 F.2d at 1173, citing *Walker v. Harris*, 642 F.2d 712, 714 (4th Cir. 1981); *Marsh v. Harris*, 632 F.2d 296, 300 (4th Cir. 1980). To fulfill this duty, the ALJ may refer a claimant for a consultative examination to resolve inconsistencies in the evidence or when the medical

evidence is insufficient to allow the ALJ to make an informed decision on the claim. 20 C.F.R. § 404.1519a(b) and § 416.919a(b). Furthermore, an ALJ must obtain an updated medical opinion from a medical expert "[w]hen additional medical evidence is received that in the opinion of the administrative law judge . . . may change the State agency medical or psychological consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing of Impairments." SSR 96-6p. "While the ALJ must make a reasonable inquiry into a claim of disability, he has no duty 'to go to inordinate lengths to develop a claimant's case.'" *Craft v. Apfel*, 164 F.3d 624, 1998 WL 702296, at *2 (4th Cir. 1998) (per curiam) (unpublished table decision), citing *Thomas v. Califano*, 556 F.2d 616, 618 (1st Cir. 1977).

The ALJ noted that Plaintiff's representative had argued that her impairments equaled Listings 1.02(a), 1.03, and 1.04(A) and (C). Tr. at 15. He further acknowledged that Plaintiff's representative had "requested a consultative examination should it be unclear as to whether the medical evidence documents that the claimant meets or equals a Medical Listing." *Id.* The ALJ indicated that MRI studies had indicated nerve root compression in Plaintiff's back, but he concluded that "the evidence does not show that the claimant has motor loss, such as atrophy or muscle weakness" or "establish spinal arachnoiditis or pseudoclaudication resulting in an inability to ambulate effectively." *Id.* He determined Plaintiff's impairment did not "rise to the level of Medical Listing 1.04." *Id.*

Because the ALJ found that Plaintiff did not meet Listing 1.04(A) based on a lack of evidence of motor loss, atrophy, or muscle weakness, the undersigned has examined

the record as to this criterion. Plaintiff argues that she meets the "motor loss" criterion based on evidence that she ambulates with an antalgic gait. [ECF Nos. 10 at 20 and 15 at 3]. However, the Listing specifies that "motor loss" is characterized by "atrophy with associated muscle weakness or muscle weakness." 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 1.04(A). A thorough review of the record yields no evidence of atrophy or muscle weakness. On July 29, 2009, Dr. Kilburn and Ms. Turner observed Plaintiff to have full, symmetric strength throughout with normal muscle bulk and tone. Tr. at 322. In February and May 2011, Dr. Reddick indicated Plaintiff had normal muscle bulk/no atrophy, normal muscle tone, and 5/5 muscle strength. Tr. at 361 and 365. On March 4, 2013, Ms. Abbott noted Plaintiff had 5/5 muscle strength. Tr. at 297. Ms. Burton also observed Plaintiff to have 5/5 motor strength in her upper and lower extremities in October 2013 and April 2014. Tr. at 319 and 358. She noted Plaintiff had normal motor functioning and 5/5 motor strength in her bilateral upper and lower extremities in May and June 2014. Tr. at 353 and 355–56.

The undersigned considers Plaintiff's argument to be similar to the argument rejected in *Henderson*. In *Henderson*, 643 F. App'x at 276, the plaintiff argued the ALJ erred in failing to find he was disabled based on Listing 1.04(A). The court found that the plaintiff "provided no evidence of atrophy, and his evidence of muscle weakness—a lone clinical finding that his leg strength was 4+/5—fails to undercut the substantial conflicting evidence in the record that his strength was consistently "5/5," "stable," or "normal." *Henderson*, 643 F. App'x at 276. Thus, the court found that substantial evidence supported the ALJ's finding that Listing 1.04(A) was inapplicable. Plaintiff's

34

argument in the instant case is slightly less persuasive than that rejected by the court in *Henderson* because she has pointed to no evidence of atrophy or muscle weakness. In light of the Fourth Circuit's decision in *Henderson* and in the absence of evidence of atrophy or muscle weakness, the undersigned recommends the court find that substantial evidence supports the ALJ's conclusion that Plaintiff did not prove her impairment met Listing 1.04(A).

Plaintiff directs the court to *Cook* and argues that the ALJ's duty to compare her symptoms to each criterion in the Listing continued despite the fact that he found she did not have the atrophy or muscle weakness required to meet the Listing. [ECF No. 10 at 22]. The undersigned notes that because the impairment must meet all the criteria under the Listing, Plaintiff could not meet Listing 1.04(A), even if she satisfied all of the additional criteria under the Listing. Nevertheless, a review of the ALJ's decision reveals that he considered the other criteria under Listing 1.04(A). *See* Tr. at 15 (noting that the MRI showed nerve root compression), 17 (citing findings of tenderness and decreased ROM of Plaintiff's lumbar spine, positive SLR, and asymmetric DTRs), 19 (indicating Plaintiff complained of back pain, but denied leg weakness, numbness, or loss of bowel or bladder control and had no muscular weakness, no motor or sensory deficits, and full ROM of all extremities in June 2014; stating Plaintiff had normal motor strength of her lower extremities, negative SLR, 2+ reflexes, and a normal motor system test in mid-June 2014; noting Plaintiff had "only 'mild' tenderness to palpation of the low back" in August 2014).

As the court acknowledged in *Henderson*, the claimant bears the burden of demonstrating that her impairment or impairments meet or equal the Listing. Although Plaintiff argues that her impairment meets or equals Listing 1.04(A), she fails to address the criteria for a finding of equivalency. *See* ECF No. 10 at 20–23. In the absence of an argument from Plaintiff as to how the evidence supported a finding that her impairments were equivalent to Listing 1.04(A), the undersigned declines to weigh the evidence.

The undersigned recommends the court find the ALJ did not err in declining to refer Plaintiff for a consultative examination. The ALJ acknowledged that Plaintiff's counsel had requested she be referred for a consultative examination, but concluded that the record included sufficient evidence for him to assess the criteria under Listing 1.04. *See* Tr. at 15. The record contained adequate evidence for the ALJ to assess whether Plaintiff met the criteria under Listing 1.04(A) in the form of MRI reports, SLR tests, and multiple assessments of Plaintiff's ROM, motor strength, sensation, and reflexes. *See Cook*, 783 F.2d at 1173; 20 C.F.R. § 404.1519a(b) and § 416.919a(b). The ALJ cited this evidence throughout his decision. *See* Tr. at 15, 17, 19, and 21.

The undersigned further recommends the court find the ALJ did not err in failing to obtain an updated medical opinion as to whether Plaintiff's impairments were equivalent to Listing 1.04(A). The ALJ's decision reflects that he reviewed the opinions of the two state agency consultants who considered the evidence. *See* Tr. at 20. Pursuant to SSR 96-6p:

> The signature of the State agency medical or psychological consultant on the SSA-831-U5 (Disability Determination and Transmittal Form) . . . ensures that consideration by a physician (or psychologist) designated by

> the Commissioner has been given to the question of medical equivalence at
> the initial and reconsideration level of administrative review. Other
> documents, including the Psychiatric Review Technique Form and various
> other documents on which medical and psychological consultants may
> record their findings, may also ensure that this opinion has been obtained at
> the first two levels of administrative review.

SSR 96-6p. The record contains signed forms that bear the signatures of Dr. Ferrell and

Dr. Upchurch and reflect that they reviewed the record for medical equivalence at the

initial and reconsideration levels. *See* Tr. at 68 and 76. A Disability Determination

Explanation indicates Dr. Ferrell reviewed evidence from Due West Family Medicine

received on February 12, 2013, Pain Management Associates received on February 1,

2013, and Lakelands Orthopedic Clinic received on January 23, 2013. Tr. at 61. Dr.

Ferrell stated he reviewed an MRI of Plaintiff's lumbar spine that showed a protruding

disc, mild stenosis, and nerve root compression. Tr. at 65. However, he did not find that

there was sufficient evidence to suggest Plaintiff's impairment met or equaled Listing

1.04. *See* Tr. at 63. A second Disability Determination Explanation shows that Dr.

Upchurch reviewed the records Dr. Ferrell examined earlier and additional records from

Due West Family Medicine received on April 9, 2013.[5] Tr. at 70–71. He considered the

---

[5] These records were consistent with pages 212–303 of the record and included reports
from the January 2011 MRI of Plaintiff's lumbar spine (Tr. at 293); the March 2012 x-
rays and MRI of Plaintiff's left knee (Tr. at 233 and 234); treatment records from Dr.
Reddick dated March 15, 2012 (Tr. at 220–22) and March 29, 2012 (Tr. at 227–29);
Hyalgan injections to Plaintiff's left knee on April 18 and 25 and May 2, 9, and 16, 2012
(Tr. at 238, 239, 244, 247, and 254); treatment records from Ms. Abbott dated January
18, 2011 (Tr. at 289), February 2, 2011 (Tr. at 287–88), August 2, 2012 (Tr. at 281),
September 4, 2012 (Tr. at 279–80), October 2, 2012 (Tr. at 277), November 6, 2012 (Tr.
at 276), December 4, 2012 (Tr. at 273–74), January 4, 2013 (Tr. at 271–72), March 4,
2013 (Tr. at 297–98); a treatment record from Dr. Henry dated November 28, 2011 (Tr.
at 285); a treatment note from Mr. Groth dated February 9, 2012 (Tr. at 214–19); a

January 2011 MRI of Plaintiff's lumbar spine. Tr. at 72. However, he also determined there was insufficient evidence to consider Listing 1.04. *See* Tr. at 73. While neither Dr. Ferrell nor Dr. Upchurch explicitly indicated that he considered whether Plaintiff's impairment was equivalent to Listing 1.04, their signatures on the forms are sufficient to show that they considered all Listings to which Plaintiff's impairments may be medically equivalent. *See Smith v. Astrue*, 457 F. App'x 326, 328 (4th Cir. 2011), citing SSR 96-6p (rejecting the plaintiff's argument that the ALJ failed to obtain an opinion on medical equivalence from a medical expert because the record contained signed Disability Determination and Transmittal forms from the state agency consultants).

Although Plaintiff cites evidence that was not in the record at the time that Dr. Ferrell and Dr. Upchurch reviewed the decision (ECF No. 10 at 20–21), she indicates the new evidence demonstrates the same findings as the evidence Dr. Ferrell and Dr. Upchurch considered and found insufficient to indicate medical equivalence to Listing 1.04. *See* ECF No. 10 at 20–21 (referencing the MRI report at Tr. at 293; evidence of mild generalized tenderness in the lumbar area and "movement restricted in all directions at the lumbar spine" at Tr. at 217, 221–22, 229, 361, 365, and 368; indications of antalgic gait at Tr. at 218, 222, 229, 361–62, 365, and 369); evidence of reduced reflexes at the Achilles and no reflexes at the medial hamstring at Tr. at 207, 221, 228, and 361; and notations of positive SLR test at Tr. at 218, 222, 229, 361–62, 365, and 369). Because Plaintiff points to no additional medical evidence that was likely to change the medical

---

treatment note from Dr. Cathcart dated February 27, 2012 (Tr. at 265–66); and a treatment note from Dr. Gray dated September 9, 2012 (Tr. at 262).

consultants' finding that Plaintiff's impairments were not equivalent in severity to a Listing, the ALJ did not err in declining to obtain a new opinion from a medical expert.

Pursuant to 20 C.F.R. § 404.1527(d)(2) and § 416.927(d)(2), final responsibility for deciding whether an individual's impairment meets or equals the requirements of any impairment in the Listings is reserved to the Commissioner. In light of the aforementioned evidence, the undersigned recommends the court find the ALJ adequately exercised his authority in concluding that Plaintiff's impairments did not meet or equal Listing 1.04(A).

### 3.    Opinion Evidence

Plaintiff argues the ALJ erred in according little weight to Dr. Tollison's and Ms. Burton's opinions. [ECF No. 10 at 23]. She maintains her medical providers' opinions are supported by substantial evidence. *Id.* at 24. She contends that the VE testified that the limitations Dr. Tollison and Ms. Burton indicated would preclude her from engaging in competitive work. *Id.* at 25.

The Commissioner argues that because neither Dr. Tollison nor Ms. Burton is a treating physician, their opinions are not entitled to controlling weight. [ECF No. 14 at 18]. She maintains Dr. Tollison's opinion was based on a one-time assessment and was inconsistent with Plaintiff's own description of her ADLs. *Id.* She contends the ALJ gave Ms. Burton's opinion little weight because it was inconsistent with her clinical findings. *Id.* at 18–19.

ALJs must consider all medical opinions of record. 20 C.F.R. § 404.1527(b) and § 416.927(b). Medical opinions may only be rendered by acceptable medical sources,

which include licensed physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists. SSR 06-03p; 20 C.F.R. § 404.1513(a) and § 416.913(a). The regulations require that ALJs accord controlling weight to treating physicians' medical opinions that are well-supported by medically-acceptable clinical and laboratory diagnostic techniques and that are not inconsistent with the other substantial evidence of record. 20 C.F.R. § 404.1527(c)(2) and § 416.927(c)(2); SSR 96-2p.

If the record contains no opinion from a treating physician or if the ALJ determines that the treating physician's opinion is not entitled to controlling weight, he is required to evaluate all medical opinions of record based on the factors in 20 C.F.R. § 404.1527(c) and § 416.927(c). Those factors include (1) the examining relationship between the claimant and the medical provider; (2) the treatment relationship between the claimant and the medical provider, including the length of the treatment relationship and frequency of treatment and the nature and extent of the treatment relationship; (3) the supportability of the medical provider's opinion in his treatment records; (4) the consistency of the medical opinion with other evidence in the record; (5) the specialization of the medical provider offering the opinion; and (6) any other relevant factors that tend to support or detract from the opinion. *Johnson*, 434 F.3d at 654; 20 C.F.R. § 404.1527(c) and § 416.927(c). ALJs are not required to expressly discuss each factor in 20 C.F.R. § 404.1527(c), but their decisions should demonstrate that they considered and applied all the factors and accorded each opinion appropriate weight in

light of the evidence of record. *See Hendrix v. Astrue*, No. 1:09-1283-HFF, 2010 WL 3448624, at *3 (D.S.C. Sept. 1, 2010).

Other sources, including nurse practitioners, physician assistants, licensed clinical social workers, naturopaths, chiropractors, audiologists, therapists, educational personnel, social welfare agency personnel, rehabilitation counselors, spouses, other relatives, friends, neighbors, clergy, and former coworkers and employers, may offer opinions, as well. *See* 20 C.F.R. § 404.1513(d) and § 416.913(d). Although ALJs are not required to evaluate these sources' opinions as stringently as opinions from acceptable medical sources, they should be guided by the basic principles outlined in 20 C.F.R. § 404.1527 and § 416.927 in considering them. SSR 06-03p.

"An ALJ's determination as to the weight to be assigned to a medical opinion generally will not be disturbed absent some indication that the ALJ has dredged up 'specious inconsistencies," *Scivally v. Sullivan*, 966 F.2d 1070, 1077 (7th Cir. 1992), or has failed to give a sufficient reason for the weight afforded a particular opinion." *Dunn v. Colvin*, 607 F. App'x 264, 267 (4th Cir. 2015), citing 20 C.F.R. § 404.1527(d).

In view of the aforementioned authority, the undersigned examines the ALJ's consideration of Dr. Tollison's and Ms. Burton's opinions.

a.     Dr. Tollison's Opinion

Dr. Tollison completed a medical source statement form on August 29, 2014. Tr. at 392–94. He stated Plaintiff could occasionally lift up to 20 pounds; sit for six hours in an eight-hour workday; and stand/walk for one hour in an eight-hour workday. Tr. at 392. He indicated Plaintiff did not need a cane to ambulate and was not required to elevate her

feet while sitting. Tr. at 393. He stated Plaintiff could occasionally balance and climb stairs and ramps, but should never climb ladders or scaffolds, stoop, kneel, crouch, or crawl. Tr. at 394. He indicated his assessment was supported by findings of degenerative disc disease and severe osteoarthritis of the knees. *Id.* He estimated Plaintiff would be absent from work more than three times per month. *Id.* Dr. Tollison indicated Plaintiff's experience of pain was frequently severe enough to interfere with attention and concentration needed to perform even simple work tasks. *Id.* He stated Plaintiff's limitations had lasted or were expected to last for 12 consecutive months. *Id.*

The ALJ discussed Dr. Tollison's August 2014 examination. Tr. at 19. He noted that Dr. Tollison had described Plaintiff as ambulating with a limp, having difficulty getting on and off the examination table, being unable to touch the floor because of back pain, and being unable to squat because of knee problems. *Id.* He indicated Dr. Tollison had observed Plaintiff to have knee swelling, clicking and popping in her left knee, crepitation in both knees, 1+ edema on the left, and 1+ and symmetrical DTRs. *Id.* He noted Dr. Tollison had observed Plaintiff to have full ROM of her hips and only mild tenderness to palpation of her low back. *Id.* He stated Dr. Tollison had indicated Plaintiff did not require a cane to ambulate and did not need to elevate her legs. Tr. at 21.

The ALJ summarized the restrictions Dr. Tollison imposed in his opinion statement and accorded the opinion "little weight." Tr. at 21. He noted that Dr. Tollison performed an "independent medical evaluation." *Id.* He found that the assessment was "incomplete" because Dr. Tollison "limited" Plaintiff "to seven hours of work per day."

*Id.* He stated the opinion was unsupported by "the other clinical examination findings and the claimant's own activities of daily living." *Id.*

The ALJ properly declined to accord controlling weight to Dr. Tollison's opinion because he was not a treating physician. *See* 20 C.F.R. § 404.1527(c)(2) and § 416.927(c)(2); SSR 96-2p. He noted that Dr. Tollison performed an "independent medical evaluation." Tr. at 21. Thus, the examining factor weighed in favor of Dr. Tollison's opinion, but the absence of a treating relationship did not. *See* 20 C.F.R. § 404.1527(c)(1), (2) and § 416.927(c)(1), (2).

The ALJ considered the supportability of Dr. Tollison's opinion, but ultimately concluded that it was inconsistent with Plaintiff's ADLs and the other clinical examination findings. Earlier in the decision, the ALJ discussed Plaintiff's ADLs and concluded they were "not limited to the extent one would expect, given her complaints of disabling symptoms and limitations." Tr. at 19–20. He specifically cited Plaintiff's indication that "she was up and down all day" and her abilities to dress herself, cook, wash dishes, dust, shop for groceries, watch television and talk on the phone without distraction, visit her sister's house on special occasions, go to lunch with friends once a month, ride a stationary bicycle for ten minutes at a time, and sleep for five to six hours at a time. *See id.*

Although the ALJ did not specify how Dr. Tollison's opinion was "inconsistent with the other clinical examination findings" in the same paragraph that he discussed the opinion, he explained earlier in the decision why the clinical findings did not suggest that Plaintiff's pain would preclude all work. He stated the following:

> [T]reatment records show that the claimant has experienced at least some pain relief with medications. (Exhibits 1F, 3F–4F). In addition, the claimant still is able to ambulate without the use of an assistive device. (Exhibit 1F). In addition, it is noted that she has not been hospitalized for a significant period of time for her back pain. All these factors indicate that the level of pain is not as severe as alleged.

Tr. at 18. The ALJ noted that Plaintiff had repeatedly indicated she took her pain medication sparingly or only when her pain was "really bad." Tr. at 18 and 19. After reciting Dr. Tollison's and the other treating and examining providers' clinical examination findings, the ALJ concluded "[w]hile the medical evidence of record shows that the claimant experiences significant limitations as a result of her severe impairments, she is still capable of performing sedentary work with additional nonexertional restrictions, which account for such limitations caused by her pain and decreased mobility." Tr. at 19.

The ALJ found that Dr. Tollison's opinion was "incomplete" because he "limited Plaintiff to seven hours of work per day." Tr. at 21. While a physician may limit a claimant to less than eight hours of work per day, the ALJ correctly noted that Dr. Tollison's opinion was incomplete to the extent that he failed to identify evidence that supported a restriction to a seven-hour workday. *See Dunn*, 607 F. App'x at 268 ("Generally, the more the medical source presents relevant evidence to support his opinion, and the better that he explains it, the more weight his opinion is given.").

The ALJ's decision reflects that he considered the factors in 20 C.F.R. § 404.1527(c) and § 416.927(c) and relied on the absence of a treating relationship, inconsistency with Plaintiff's ADLs and other examination findings, and a general lack of

explanation in weighing Dr. Tollison's opinion. Although Plaintiff points to other evidence of record that arguably provides support for Dr. Tollison's opinion (ECF No. 10 at 24 and 15 at 3–4), it is not the role of this court to reweigh the evidence. *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). Because the ALJ provided an adequate explanation to support his decision to accord little weight to Dr. Tollison's opinion, the undersigned recommends the court find that substantial evidence supported his weighing of the relevant factors.

> b.     Ms. Burton's Opinion

On May 6, 2014, Ms. Burton completed a medical source statement of ability to do work-related activities form. Tr. at 323–25. She indicated Plaintiff could frequently carry up to 10 pounds and could occasionally carry 11–20 pounds. Tr. at 323. She stated Plaintiff's last MRI on November 26, 2011, showed a bulging/protruding disc at L4-5 and degenerative changes consistent with central canal stenosis and S1 nerve compression. *Id.* She indicated Plaintiff could sit for a maximum of two to three hours and could stand for 15–20 minutes without having to stop because of back pain. *Id.* She indicated Plaintiff would need a job that permitted her to shift positions at will from sitting, standing, or walking. *Id.* She indicated Plaintiff did not use a cane to ambulate. Tr. at 324. She stated Plaintiff had difficulty shifting positions and getting on the exam table. *Id.* She noted Plaintiff's lumbar region was tender to palpation. *Id.* She indicated Plaintiff's legs should be elevated with prolonged sitting and stated she should elevate her legs at the level of her heart for 50% of an eight-hour workday. *Id.* She indicated the following: "*Keeps legs elevated at home. Orthopedic has prescribed compression

stocking for edema to left knee & leg." *Id.* She stated Plaintiff could never use her hands to push/pull; could occasionally use her hands for handling; could frequently use her hands for reaching overhead and in all other directions; and could continuously use her hands for fingering and feeling. *Id.* She noted that Plaintiff's back pain was exacerbated by reaching, pushing, and pulling. *Id.* She indicated Plaintiff could never climb ladders or scaffolds, stoop, kneel, crouch, or crawl. Tr. at 325. She stated Plaintiff could occasionally climb ramps and stairs and balance. *Id.* She noted that an x-ray showed osteoarthritis in Plaintiff's right knee on February 5, 2009. *Id.* She anticipated Plaintiff would be absent from work more than three times per month. *Id.* She stated Plaintiff's experience of pain was frequently severe enough to interfere with attention and concentration needed to perform even simple work tasks. *Id.* Finally, she indicated Plaintiff's limitations had lasted or were expected to last for 12 consecutive months. *Id.*

On a second form, Ms. Burton indicated Plaintiff had

Major dysfunction of a joint(s) (due to any cause) characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankyloses, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s).

Tr. at 326. She stated Plaintiff also had

Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle) resulting in inability to ambulate effectively (i.e., insufficient lower extremity functioning to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities).

*Id.*

The ALJ summarized the restrictions Ms. Burton included in the medical source statement. Tr. at 20–21. He indicated he gave her opinion "little weight." Tr. at 21. He noted that Ms. Burton was not a physician or specialist. *Id.* He indicated her clinical findings were "at least somewhat inconsistent with her opinion." *Id.* He discussed Ms. Burton's observations during the May 2014 office visit. *Id.* He indicated Ms. Burton observed Plaintiff to have a slowed gait and to be tender in her lumbar spine, but to have normal motor strength, only trace edema, a negative SLR test, a normal motor examination, and 2+ patellar reflexes. *Id.* He indicated Ms. Burton noted that Plaintiff's condition was stable and that she only took Lortab when her pain was really bad. *Id.* He specified that Ms. Burton's indication that Plaintiff needed to elevate her legs was "primarily . . . a hearing related development that is not well-established by the other evidence of record." *Id.*

The ALJ stated he gave little weight to Ms. Burton's opinion that Plaintiff's impairment met Listing 1.02. Tr. at 15. He indicated the evidence did not show that Plaintiff was unable to ambulate effectively. *Id.* He pointed out that Ms. Burton had opined in the medical source statement that Plaintiff did not require the use of a cane to ambulate. *Id.*

Although Ms. Burton was a treating medical provider, she was a nurse practitioner and was, therefore, not an acceptable medical source. *See* SSR 06-03p; 20 C.F.R. § 404.1513(a) and § 416.913(a). Thus, the ALJ did not err in declining to accord controlling weight to Ms. Burton's opinion. *See* 20 C.F.R. § 404.1527(c)(2) and § 416.927(c)(2); SSR 96-2p.

A review of the ALJ's decision demonstrates that he was guided by the factors in 20 C.F.R. § 404.1527(c) and 416.927(c) in weighing Ms. Burton's opinion. He considered the examining and treating relationship, noting that Ms. Burton was "the claimant's treating nurse practitioner" (Tr. at 15) and discussing Plaintiff's treatment visits and Ms. Burton's clinical findings in May and June 2014 (Tr. at 19 and 21). *See* 20 C.F.R. § 404.1527(c)(1), (2) and § 416.927(c)(1), (2). He considered the supportability factor and identified a significant inconsistency between Ms. Burton's two statements regarding the need for an ambulatory assistive device. *See* Tr. at 15; *see also* 20 C.F.R. § 404.1527(c)(3) and 416.927(c)(3). He also found that the limitations Ms. Burton identified in her medical source statement were inconsistent with her examination report from the same day. *See* Tr. at 21; *see also* 20 C.F.R. § 404.1527(c)(3) and 416.927(c)(3). He determined Ms. Burton's opinion as to the Plaintiff's need to elevate her legs and the effects of her pain were inconsistent with the record as a whole. *See* Tr. at 19 and 21. He considered the specialization factor and concluded that the fact that Ms. Burton was neither a physician nor a specialist diminished the value of her opinion. *See* 20 C.F.R. § 404.1527(c)(5) and § 416.927(c)(5). While Plaintiff cites evidence that arguably supports Ms. Burton's opinion (ECF No. 10 at 25 and 15 at 4), the court may not reweigh the evidence. *Craig*, 76 F.3d at 589. Because the ALJ adequately explained that the factors in 20 C.F.R. § 404.1527(c) and § 416.927(c) supported his decision to give little weight to Ms. Burton's opinion, the undersigned recommends the court find that substantial evidence supported his finding.

III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the Commissioner, but to determine whether her decision is supported as a matter of fact and law. Based on the foregoing, the undersigned recommends the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

March 13, 2017                                    Shiva V. Hodges
Columbia, South Carolina                    United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).